J-S11003-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.P.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 170 EDA 2024 |

Appeal from the Decree Entered January 10, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000257-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: K.K.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 171 EDA 2024 |

Appeal from the Decree Entered January 10, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000258-2023

BEFORE:   BOWES, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY BOWES, J.:                                  **FILED MAY 7, 2024**

---

[*] Retired Senior Judge assigned to the Superior Court.

D.B. ("Mother") appeals from the decrees terminating her parental rights as to her two children, K.K.B., born in November 2020, and N.P.B., born in February 2022.[1] We affirm.

We glean the following background from the certified record. In March 2021, DHS first became acquainted with Mother, who was then fifteen years old and was caring for four-month-old K.K.B. At that time, DHS implemented a safety plan entailing keeping K.K.B. with maternal grandmother whenever Mother was not home, which Mother promptly violated by running away from home with K.K.B. and spending the night at the house of a male friend. DHS referred Mother and maternal grandmother to the Community Umbrella Agency ("CUA"), which offered them information relating to programs aimed at assisting teen mothers.

Approximately six months later, in September 2021, DHS learned that Mother had left K.K.B. in the care of his maternal aunt since May. Additionally, she was moving around from place to place, using illegal substances, and neglecting to visit K.K.B. regularly throughout that time. K.K.B.'s maternal aunt indicated to DHS a willingness to care for K.K.B. but expressed that she would need financial assistance in doing so, particularly relating to daycare. DHS was also informed that Mother had been diagnosed with oppositional

---

[1] Separately, on the same date, the trial court terminated the parental rights of N.P.B.'s biological father, N.B., as well as any unknown putative father of K.K.B. Neither N.B. nor any putative father of K.K.B. have appealed that decision.

defiant disorder and attention deficit hyperactivity disorder and had a history of mental health hospitalizations, and that she was not taking any steps to address those concerns.

Accordingly, DHS filed an emergency dependency petition as to K.K.B., and the trial court adjudicated K.K.B. dependent on October 15, 2021. The court also entered an order directing Mother to maintain contact with CUA, undertake parenting education, attend school daily, receive an evaluation from the Behavioral Health System, and comply with several other conditions. In December 2021, CUA created an initial single case plan ("SCP") for Mother, requiring her to, *inter alia*, obey CUA case management and court orders, engage in parenting education, prenatal care for her pregnancy with N.P.B., supervised visits with the agency, and address her mental health concerns with Merakey, a provider of therapeutic and educational services. At all relevant times, K.K.B. has been living with the same maternal aunt, who is a pre-adoptive resource parent.

Mother gave birth to N.P.B. in February 2022. Her SCP was revised to reflect postnatal care as to N.P.B. Mother failed to attend status hearings held regarding K.K.B. in April and May 2022. Additionally, DHS ascertained in April 2022 that N.P.B. had been left with a family friend without sufficient supplies and that the caretaker did not hear from Mother for over a week. DHS also determined that the child had not been examined by a doctor and was not up to date on her immunizations. After investigation, DHS concluded that the family friend was not an appropriate caregiver for N.P.B. Accordingly, it took

protective custody of N.P.B., whom the trial court adjudicated dependent on June 8, 2022. N.P.B. was subsequently placed with a maternal cousin. Although K.K.B. and N.P.B. were placed with different maternal relatives, the respective pre-adoptive kinship parents communicated frequently and often allowed the children to see each other and go on trips together.

Throughout the remainder of 2022 and the first half of 2023, Mother failed to appear for several permanency hearings and missed multiple scheduled visits with the children. She also tested positive for marijuana on several CUA drug screenings during that time. In July 2023, DHS filed a petition seeking to change the children's permanency goals from reunification to adoption by their respective kinship care providers, as well as termination of the parental rights of Mother, D.B., and any unknown putative father of K.K.B. The court held a hearing on January 10, 2024, where it heard from CUA case manager Edward McNichol and Mother.[2]

Mr. McNichol testified that he was assigned to this case approximately ten months before and had managed it since then. He stated that as of the date of the hearing, Mother had not obtained stable and appropriate housing. She had been frequently relocating from place to place, and while she was currently living in an apartment with a relative, she was not named on the

---

[2] At the termination hearings, both children were represented by Nghi Duong Vo, Esquire, as legal counsel and guardian *ad litem* ("GAL"). At the time, K.K.B. was three years old and N.P.B. was twenty-two months old. ***See In re T.S.***, 192 A.3d 1080, 1088 (Pa. 2018) (reaffirming the principle that "where a child is too young to express a preference, it would be appropriate for the GAL to represent the child's best and legal interests simultaneously").

lease. Further, other people who had not undergone background checks or otherwise been approved also had access to the apartment.

Mr. McNichol also attested that Mother did not complete parenting classes, that her communication with CUA was sporadic, and that there were periods where CUA could not reach or locate her. He noted that she did not begin any sort of mental health or drug treatment until enrolling in The Bridge Way School ("Bridge Way") in the fall of 2023, after the petitions to terminate her parental rights were filed. He further indicated that Mother was temporarily expelled from Bridge Way for being under the influence of illegal substances and was only permitted to re-enroll as of the morning of the hearing. Mr. McNichol also verified that Mother tested positive for marijuana on a CUA drug screen conducted on August 4, 2023.

As to Mother's care of the children, it was noted that she never attended any of their medical appointments. Her visitation was inconsistent, and she only saw the children twice in the three months leading up to the date of the hearing, despite CUA providing bus passes for Mother's use. Mr. McNichol testified that this baffled the pre-adoptive kinship care providers, who were very open to visits from Mother, even on short notice. Similarly, Mother did not engage in video calls with the children to maintain a relationship with them. Mr. McNichol also confirmed that both children have wonderful relationships with their respective kinship care providers, and that their needs were being fully met. Ultimately, he did not believe reunification with Mother

was possible, and that the children would be substantially harmed by removing them from their current family environments.

For her part, Mother testified that she was never expelled from Bridge Way and that she was completely drug-free during her time there. She blamed her lack of visitation on the kinship care providers, who she claimed were non-responsive to her communications. Mother also asserted that she was on the lease for the apartment where she was residing, but she never provided a copy of the lease to Mr. McNichol because he never asked for one. However, she did not present a copy at the termination hearing despite the opportunity to do so. Mother also claimed that her children have a bond with her because K.K.B. calls her "mom" and knows who she is, and that while N.P.B. does not speak much yet, she also recognizes Mother.

Upon the conclusion of testimony, the GAL informed the trial court that he believed the best interests of both children would be served by termination of the parental rights of Mother. The trial court agreed and entered separate decrees terminating Mother's parental rights as to both children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8), as well as § 2511(b), and changed the children's permanency goals to adoption.

Mother filed contemporaneously in each case notices of appeal and statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The trial court entered a notice of compliance with Rule 1925(a), referring us to relevant portions of the transcript from the

termination hearing, wherein it recited its findings. We consolidated the appeals *sua sponte*.

Mother presents five issues for our consideration:

I. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother . . . pursuant to 23 Pa.C.S. [§] 2511(a)(1) where Mother presented evidence that she tried to perform her parental duties.

II. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother . . . pursuant to 23 Pa.C.S. [§] 2511(a)(2) where evidence was provided to establish that the children w[ere] removed from the care of . . . Mother and Mother is now capable of caring for her children.

III. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother . . . pursuant to 23 Pa.C.S. [§] 2511(a)(5) where evidence was presented to show that Mother is now capable of caring for her children.

IV. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother . . . pursuant to 23 Pa.C.S. [§] 2511(a)(8) where evidence was presented to show that Mother is now capable of caring for her children.

V. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Mother . . . pursuant to 23 Pa.C.S. [§] 2511(b) where evidence was presented that the children initially lived with her and she attended visits when she was permitted to visit with her children.

Mother's brief at 7 (cleaned up).

We begin with our well-settled standard of review.

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to

accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the lower court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 255 A.3d 343, 358–59 (Pa. 2021) (cleaned up).

"The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child, which we have described as follows:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [§] 2511(a). Only if the court determines that the parent's conduct warrants termination of his

- 8 -

or her parental rights does the court engage in the second part of the analysis pursuant to [§] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re Adoption of B.G.S.*, 245 A.3d 700, 705 (Pa.Super. 2021) (citations omitted). The bases for termination must be proven by clear and convincing evidence, or evidence "that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Int. of M.E.*, 283 A.3d 820, 831 (Pa.Super. 2022) (citation omitted).

Termination is proper when the moving party proves grounds for termination under any subsection of § 2511(a), as well as § 2511(b). *See In re N.A.M.*, 33 A.3d 95, 100 (Pa.Super. 2011) (stating that "[w]e must agree with the trial court's decision as to only one subsection of . . . § 2511(a) in order to affirm the termination of parental rights"). Here, we consider § 2511(a)(2) and (b), which provide in pertinent part as follows:

> **(b) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

- 9 -

. . . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S. § 2511.

The grounds for termination of parental rights pursuant to § 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct, but may also include acts of refusal and inability to perform parental duties. *See In re S.C.*, 247 A.3d 1097, 1104 (Pa.Super. 2021). We have long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *See*, *e.g.*, *In re Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa.Super. 2017). At a termination hearing, the trial court may properly reject as untimely or disingenuous a parent's vow to follow through on necessary services when the parent failed to cooperate with the agency or take advantage of available services during the dependency proceedings. *See In re S.C.*, 247 A.3d at 1105.

In concluding that DHS carried its evidentiary burden as to this subsection, the trial court noted the following on the record at the termination hearing:

The parents had more than a year to demonstrate an ability or an indication or a desire to remedy the situation which led to the child[ren] coming into care. And the parents, both the biological mother and biological father of [N.B.P.], and any unknown fathers

- 10 -

[of K.K.B.,] have not demonstrated their ability to parent these children. They haven't shown the ability to care for these children. They have not spent enough time with these children in order to establish that they can show that ability. And they have not availed themselves of the resources that were available to them in order to do so.

Most notably, again, Mother did not start to engage in her objectives until June [2023] when it came to Merakey [and her mental health treatment]. And any testimony as to Bridge Way was certainly after [the termination petition] was filed in this case.

N.T. Termination Hearing, 1/10/24, at 79-80. It noted that none of the documentation introduced by Mother established her substantial compliance with her SCP goals or showed a strong desire for reunification. *Id*. at 78. The court concluded that although Mother had made some commendable efforts recently to care for herself, "for the life of this case, her progress and compliance have not risen above minimal and none." *Id*. at 78.

Mother contends that this subsection was not met because "the evidence presented at trial showed that Mother had remedied the conditions that caused the placement of her child and is now able to care for her children." Mother's brief at 11-12. Notably, she provides no discussion as to exactly how the conditions that led to the children's placement were remedied. Instead, Mother appears to rely on assertions made elsewhere in her brief that based upon her testimony and the exhibits she offered at the termination hearing, she participated in mental health evaluations at Merakey starting in June 2023 and consistently worked toward her goals since then. *Id*. at 9-10.

Upon review, we find that the certified record supports the trial court's conclusions. The credited testimony from Mr. McNichol bore out that Mother took almost no steps to engage with the majority of her SCP goals until the children were in placement for over a year, and even then, did not begin to address the remainder until after the termination petitions were filed by DHS and shortly before the termination hearing. Nonetheless, she failed to remedy any of these concerns. Mother had inconsistent contact with CUA during that period and there were times that they could not locate or call her. Her visitation with the children was highly sporadic, with numerous cancellations, and she only saw them twice in the three months leading up to the termination hearing.

Further, the trial court did not credit Mother's testimony that she had remained drug-free and in full compliance with her objectives while attending Bridge Way, since she offered no evidence beyond her testimony to support those assertions. Despite Mother's assertions to the contrary, she tested positive for marijuana multiple times during the dependency and after the termination petitions were filed. Finally, it is clear from the record that Mother has not taken the steps necessary to ensure that her apartment would be suitable for K.K.B. and N.P.B., as she has not proven that she is named on the lease or that others with access to the apartment could pass CUA's background checks. Thus, we conclude that the trial court did not abuse its discretion in relying upon § 2511(a)(2) as a basis for terminating Mother's parental rights.

Turning to § 2511(b), we "consider the matter from the child's perspective, placing [the child's] developmental, physical, and emotional needs and welfare above concerns for the parent." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (cleaned up). This analysis "should not be applied mechanically," but "must be made on a case-by-case basis," wherein "the court must determine each child's specific needs." *Id*. at 1105-06 (cleaned up). Thus, there is no "exhaustive list" of factors that must be considered. *Id*. at 1113 n.28. While the circumstances of each case dictate the factors to be considered, our precedent indicates that relevant points of inquiry include "intangibles such as love, comfort, security, and stability." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (cleaned up).

The Pennsylvania Supreme Court has mandated, however, that an evaluation pursuant to § 2511(b) should also consider the child's bond with his or her parent. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). Specifically, the court must render "a determination of whether the bond is necessary and beneficial to the child[.]" *In the Interest of K.T.*, 296 A.3d at 1113. This involves consideration of the effect of severing the child's bond with the parent. *Id*. at 1109. In termination matters, "severance of a necessary and beneficial relationship is the kind of loss that would predictably cause 'extreme emotional consequences' or significant, irreparable harm." *Id*. at 1109-10 (quoting *In re E.M.*, 620 A.2d at 484).

- 13 -

Furthermore, "courts must not only consider the child's bond with the biological parent, but also examine" the child's bond "with the **foster** parent." *Id*. at 1111 (emphasis in original, cleaned up). Thus, we consider factors that arise from the circumstances of each case, such as the child's need for permanency and length of time in foster care, whether the child is bonded with the foster parents, and whether the foster home meets the child's needs. *Id*. at 1113. Overall, "bond, plus permanency, stability and all intangible factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of primary importance in the [§] 2511(b) analysis." *Id*. at 1109 (cleaned up).

In weighing the bond considerations pursuant to § 2511(b), "courts must keep the ticking clock of childhood ever in mind." *In re T.S.M.*, 71 A.3d at 269. "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*. Given these crucial concerns, a court cannot "toll the well-being and permanency" of a child indefinitely in the hope that a parent "will summon the ability to handle the responsibilities of parenting." *In re C.L.G.*, 956 A.2d 999, 1007 (Pa.Super. 2008) (*en banc*) (citation omitted).

As to this subsection, Mother tersely contends that "[t]he children were not permitted to continue to visit with [her]. Mother should have been provided with ongoing visits with her children, so that she could continue to

bond with her children." Mother's brief at 20. She does not discuss any aspect of the relationship between each child and their respective pre-adoptive kinship parents.

At the termination hearing, the trial court addressed this subsection as follows:

> With regards to [§] 2511(b), there's been nothing to establish that these children have a parent-child relationship with either the known parents or any unknown father in this case. There's no indication that the children look to either of the parents to meet any of their parental needs. There's no indication that the children would be detrimentally affected if parental rights w[ere] terminated as the children don't have – there's been no demonstration of any bond of a parental nature with either of the known parents or any unknown parent.

N.T. Termination Hearing, 1/10/24, at 82. It further articulated that termination would "best serve the needs and welfare of these children who have been in loving homes with family members for the life of this case, and termination would allow them to have stability and permanency in their life." *Id*. at 81.

Again, we determine that the trial court's conclusions are fully supported by the evidence of record. Mother has not convinced us that she shares a parental bond with either K.K.B. or N.P.B, particular in light of her lack of visitation or providing any care for them for over two years. Rather, both children are attached to their respective kinship families. Three-year-old K.K.B. had been in the same placement for twenty-six months as of the hearing, more than half of his life. Similarly, twenty-three-month-old N.P.B. had been in placement for nineteen months, nearly her entire life. Mr.

- 15 -

McNichol credibly testified that the children were thriving with their respective resource families and that to remove them would substantially detriment them.

Further, the record belies Mother's assertion that she was deprived of the right to visit with the children and establish a bond with them. She failed to utilize the transportation passes CUA made available to her, and further rarely communicated with the children, even via video, despite them being with family members who encouraged frequent and spontaneous visits. In sum, the court did not err in finding that termination of Mother's parental rights would not "cause extreme emotional consequences or significant, irreparable harm." *In the Interest of K.T.*, 296 A.3d at 1109-10 (cleaned up).

Having determined that the trial court properly found statutory grounds for termination pursuant to § 2511(a)(2) and (b), we affirm the decrees terminating Mother's parental rights as to K.K.B. and N.P.B.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/7/2024

- 16 -